U.S. DISTRICT COURT – N.D. OF N.Y.
FILED
Aug 3 - 2026
John M. Domurad, Clerk

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---------------------------------------------------- 5:26-cv-1494 (BKS/MJK)

**KISTILAN JERAH DARK,**

Plaintiff,

v.

JOHN GLEASON, individually;

**COUNTY OF JEFFERSON, NEW YORK,**
a municipal corporation;

KELLY SOVA, individually;

ALEX MORGIA, individually;

**VILLAGE OF SACKETS HARBOR, NEW YORK,**
a municipal corporation;

JOHN and JANE DOES 1-10, members of the Jefferson County Sheriff's Office and/or the New York State Police whose identities are presently unknown,

Defendants.

----------------------------------------------------

Civil Action No.: [TO BE ASSIGNED]

**COMPLAINT FOR VIOLATIONS OF CIVIL RIGHTS PURSUANT TO 42 U.S.C. § 1983**

**JURY TRIAL DEMANDED**

----------------------------------------------------

**PRELIMINARY STATEMENT**

1. This is a civil rights action brought under 42 U.S.C. § 1983 arising from a discrete course of conduct beginning July 30, 2023 in which Defendant John Gleason, a sworn officer of the Jefferson County Sheriff's Office, used the authority of his office to instigate, direct, and weaponize a private individual — Plaintiff's wife, Mollie Alexandra Ratliff, who is not a party to this action — against Plaintiff, in retaliation for Plaintiff's protected First Amendment activity in complaining of and pursuing legal remedies against the Jefferson County Sheriff's Office, the Town of Hounsfield, and the Village of Sackets Harbor.

2. The conduct pleaded here is factually and temporally distinct from earlier events involving Defendant Gleason. It is pleaded as a set of discrete acts, each of which accrued and is separately actionable. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002). In the alternative, as to the events of July 30 through August 2, 2023, Plaintiff pleads that those events constitute a single continuing course of conduct.

3. Specifically, Plaintiff alleges that Defendant Gleason: (a) participated in and/or caused the escalation of a multi-day, multi-agency manhunt directed at Plaintiff that originated from nothing more than a domestic dispute over access to a residential smart-home system; (b) directed or authorized a warrantless entry onto the curtilage of Plaintiff's residence in the course of that manhunt; (c) directed, authorized, or participated in a further warrantless entry onto Plaintiff's private property at a second location, and in a blockade of Plaintiff's only route of egress from that property; (d) thereafter cultivated a personal, off-the-books channel of communication with Ms. Ratliff, giving her his personal cellular telephone number; (e) relayed to her, as though verified, a series of damaging and unverified allegations about Plaintiff, including that Plaintiff had harassed a former fiancée, had harassed a former spouse, and was the subject of a Canadian entry ban of which Plaintiff had never been officially notified; (f) coached Ms. Ratliff on the specific words to send to Plaintiff in writing, and thereafter directed or encouraged her to commence a protective-order proceeding against Plaintiff in the State of Arkansas — a forum over a thousand miles from the events, chosen so as to maximize burden and minimize Plaintiff's ability to defend; and (g) personally approached Plaintiff at a public location days later, continuing his personal involvement in this course of conduct.

3A. This action also arises from related, continuing conduct by Defendant Gleason and by officials of Jefferson County and the Village of Sackets Harbor extending through January 2026: (a) Jefferson County Dog Control's application, since April 2024, of an adoption-eligibility policy that names Plaintiff specifically and denies him services available to other members of the public, without any articulated rational basis; and (b) a strategy formulated by Village of Sackets Harbor Mayor Alex Morgia, endorsed by Village Trustee Kelly Sova, and participated in by Defendant Gleason, at an August 13, 2024 meeting of the

Village Board of Trustees, to accumulate fines and citations against Plaintiff specifically until the total justified the cost of obtaining a civil judgment and placing a lien against Plaintiff's property.

4. Plaintiff seeks compensatory damages, punitive damages against Defendants Gleason, Sova, and Morgia in their individual capacities, and such other relief as this Court deems just.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as this action arises under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to this action occurred in Jefferson County, New York, within the Northern District of New York.

7. Attorney's fees and costs are sought pursuant to 42 U.S.C. § 1988.

8. TIMELINESS. The limitations period for a § 1983 action arising in New York is three years. N.Y. C.P.L.R. § 214(5); Owens v. Okure, 488 U.S. 235 (1989). Accrual is governed by federal law and runs from the date the plaintiff knew or had reason to know of the injury. Wallace v. Kato, 549 U.S. 384, 388 (2007). Each discrete act on which Plaintiff's claims for relief rest occurred on or after August 1, 2023. The limitations periods for the acts of August 1 and August 2, 2023 fell on Saturday, August 1, 2026 and Sunday, August 2, 2026, and are extended to Monday, August 3, 2026 by Fed. R. Civ. P. 6(a)(1)(C) and N.Y. Gen. Constr. Law § 25-a. The acts of early-to-mid August 2023, of August 15, 2023, and of December 13, 2023 are timely on their face. The conduct underlying Count V — Jefferson County Dog Control's April 2024 adoption-eligibility policy and its continuing non-disclosure through January 2026 — and the conduct underlying Counts VI and VII — the August 13, 2024 fine-escalation strategy formulated by Defendant Morgia and endorsed by Defendant Sova — are independently timely, having accrued well within the three-year period regardless of the computation applicable to the August 2023 events. Allegations concerning events before August 1, 2023 — including the entry of July 30, 2023 and the January 2023 events alleged in paragraphs 24A through 24C — are pleaded as background and as evidence of motive, animus, and, as to Count IV, custom or policy, and are not relied upon as independent standalone claims. In the alternative, to the extent the events of July 30 through August 2, 2023 constitute a single continuing course of conduct that did not terminate until August 2, 2023, Plaintiff pleads that a claim arising from that course of conduct is likewise timely.

**PARTIES**

9. Plaintiff Kistilan Jerah Dark is a natural person and a resident of 114 Dodge Avenue, Sackets Harbor, New York 13685. Plaintiff is a disabled veteran. Plaintiff also owns and maintains a second parcel, known as Heron Bay Cliffs, within Jefferson County, New York and within this District, at which certain of the events alleged below occurred.

10. Defendant John Gleason was at all relevant times a sworn law enforcement officer employed by the Jefferson County Sheriff's Office, acting under color of the laws of the State of New York. He is sued individually. On information and belief, Defendant Gleason's duties have included responsibility over Jefferson County Dog Control, the Village of Sackets Harbor's policing function, and the Watertown International Airport. Plaintiff reserves the right to amend this Complaint, including to add Defendant Gleason individually to Count V below, once the precise scope of his authority over Dog Control is confirmed through discovery.

11. Defendant County of Jefferson is a municipal corporation organized under the laws of the State of New York and is the employer of Defendant Gleason.

11A. Defendant Kelly Sova was, at the time of the conduct alleged herein, an elected Trustee of the Village of Sackets Harbor, New York, acting under color of the laws of the State of New York in that capacity. She has since become the Village's Deputy Mayor. She is sued individually for her own conduct as alleged in paragraphs 79G through 79J below. Her place of business as a Village official, and a location at which she may be served, is the Village of Sackets Harbor Municipal Building, 112 N. Broad St., Sackets Harbor, New York 13685.

11B. Defendant Alex Morgia was, at the time of the conduct alleged herein and continuing to the present, the elected Mayor of the Village of Sackets Harbor, New York, acting under color of the laws of the State of New York in that capacity. He is sued individually for his own conduct as alleged in paragraphs 79G through 79J below, in which he personally formulated and articulated the fine-escalation strategy described therein. His place of business as a Village official, and a location at which he may be served, is the Village of Sackets Harbor Municipal Building, 112 N. Broad St., Sackets Harbor, New York 13685.

11C. Defendant Village of Sackets Harbor is a municipal corporation organized under the laws of the State of New York. It is sued for the policy or custom alleged in Count VII below, formulated and endorsed by its own Mayor, a Trustee, and its own Village Attorney acting within the scope of their official duties, as alleged in paragraphs 79G through 79J. It may be served through its Village Clerk at the Village of Sackets Harbor Municipal Building, 112 N. Broad St., Sackets Harbor, New York 13685, pursuant to N.Y. C.P.L.R. 311(a)(4).

12. Defendants John and Jane Does 1 through 10 are members of the Jefferson County Sheriff's Office and/or the New York State Police who personally participated in the manhunt and the curtilage entries alleged herein and whose identities are not presently known to Plaintiff. Prior to filing this Complaint, Plaintiff exercised diligence to attempt to identify these individuals, including submitting a Freedom of Information Law request to the Jefferson County Sheriff's Office in or about May 2023 concerning Defendant Gleason's conduct, as alleged in paragraph 20, and Plaintiff intends to submit further, more specific Freedom of Information Law requests for the duty rosters, dispatch records, and CAD records for July 30, 2023, August 1 through 2, 2023, and December 13, 2023. Plaintiff will amend this Complaint to name these individuals, and such amendment should relate back pursuant to N.Y. C.P.L.R. 1024, once their identities are learned through discovery.

13. Mollie Alexandra Ratliff, known on social media most of the time as "Mollie Alexandra," using the handle "finding_mollie" or variations thereof, is and at all relevant times was Plaintiff's spouse. She never formally or legally changed her surname to Dark. She is not a party to this action and Plaintiff does not seek relief against her here. Her conduct is alleged as that of a private individual who acted in concert with a state actor and is offered as evidence supporting Plaintiff's claims against Defendant Gleason, including under the joint-action doctrine of Dennis v. Sparks, 449 U.S. 24, 27-28 (1980), and Ciambriello v. County of Nassau, 292 F.3d 307, 323-24 (2d Cir. 2002). At all times relevant to the events alleged in this Complaint, Ms. Ratliff was physically located more than 1,100 miles away, in the State of Arkansas, and had no in-person contact with Plaintiff or with the events described herein; her role was carried out remotely, by placing calls to law enforcement and by text message and email with Plaintiff, and, on information and belief, by text message and email with Defendant Gleason.

14. Allegations in this Complaint concerning communications between Defendant Gleason and Ms. Ratliff at which Plaintiff was not personally present are made upon information and belief, based upon Ms. Ratliff's own contemporaneous statements to Plaintiff, made almost entirely by text message and email, and on one occasion by FaceTime video call on or about October 3, 2023, during and after the events alleged, and upon the documentary record described herein. Plaintiff was never personally present with Ms. Ratliff during any of the communications on which these allegations are based; as Defendant Gleason's influence over Ms. Ratliff increased, she became increasingly unwilling to answer Plaintiff's telephone calls.

## FACTUAL ALLEGATIONS

A. Plaintiff's protected activity, known to Defendant Gleason

15. In or about June 2023, Plaintiff appeared and defended himself at trial in the Hounsfield Justice Court, Jefferson County, New York, File No. 23030004, on charges generated by Defendant Gleason. In the course of that defense, Plaintiff presented, and attempted to present, evidence that Defendant Gleason had violated Plaintiff's property and curtilage rights in obtaining the evidence underlying those charges.

16. That defense was activity protected by the First Amendment. The right to petition for redress of grievances protects a citizen's resort to the courts, Borough of Duryea v. Guarnieri, 564 U.S. 379, 387 (2011); California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972), and encompasses defending oneself against charges by asserting that the government obtained them through unconstitutional means.

17. Defendant Gleason necessarily knew of that protected activity. He was the source of the charges Plaintiff was contesting, and his own conduct was the subject of the evidence Plaintiff offered against them.

18. Cumulatively, and earlier: in or about 2019, Plaintiff spoke directly and in person to Defendant Gleason and told him that if Gleason violated Plaintiff's privacy rights again, Plaintiff would sue him.

19. That statement was likewise protected. The First Amendment protects the right of a citizen verbally to oppose and challenge the conduct of a police officer to his face, City of Houston v. Hill, 482 U.S. 451, 462-63 (1987), and a statement that the citizen will sue the officer if the officer again violates his rights implicates the Petition Clause as well. Defendant Gleason knew of this activity because Plaintiff told him of it personally, face to face.

20. Plaintiff thereafter continued to engage in protected activity, including a Freedom of Information Law request to the Jefferson County Sheriff's Office to which the Office responded in or about May 2023, and the pursuit of legal remedies arising from the events of February 2023.

21. Defendant Gleason had actual knowledge of each category of Plaintiff's protected activity described above. As to the June 2023 trial defense, Gleason knew because he generated the charges being contested and his own conduct was the subject of the evidence offered against them. As to the 2019 statement, Gleason knew because Plaintiff told him personally, face to face. No inference is required as to either.

22. Paragraphs 23 through 40, below, are pleaded as background establishing the adversarial history and course of surveillance between Defendant Gleason and Plaintiff. They are not pleaded as independent claims; any claim arising from them alone is time-barred. They are offered as evidence of ongoing antagonism, retaliatory animus, and — as to Count IV —

custom or policy.

23. Beginning in or about 2014 to 2016, Defendant Gleason displayed hostility toward Plaintiff over Plaintiff's use of the Village Recycling Center at a late hour, and thereafter stopped Plaintiff's vehicle on the asserted ground that its headlights were insufficiently bright, compelling Plaintiff to replace them, which Plaintiff did in or about 2015 or 2016.

24. In or about 2019, Defendant Gleason and/or officers under his direction maintained a stakeout of Plaintiff's driveway over four days, remaining for hours at a time, after Gleason had already been told by civilians present that Plaintiff was alive, well, and inside the residence. The stakeout served no legitimate law enforcement or welfare purpose. A May 2023 response to Plaintiff's Freedom of Information Law request recorded this four-day episode as a single response event.

24A. In or about January 2023, Plaintiff's dog Niras, then approximately thirteen years old, left Plaintiff's property while Plaintiff was occupied repairing his residence's heating system, and travelled to a neighbor's porch approximately three houses away to greet a person unfamiliar to her. Personnel of the Jefferson County Sheriff's Office and/or Dog Control took custody of Niras from that location. On information and belief, Defendant Gleason may have been among the personnel who responded; Plaintiff reserves the right to amend this allegation once Defendant Gleason's role, if any, is confirmed through discovery. No one from Dog Control or the Sheriff's Office notified Plaintiff that Niras had been taken into custody, notwithstanding that Niras was current on her vaccinations, microchipped, and registered to Plaintiff at his current address.

24B. Plaintiff learned that Dog Control had Niras only by chance, in the course of an unrelated telephone call he placed to Dog Control on behalf of a third party, Cassy Burns, who needed a rabies-certificate identification number for a puppy she had adopted from Plaintiff the preceding spring. During that call, Dog Control personnel volunteered, unprompted, that they had Niras. Plaintiff explained that, as a disabled veteran awaiting his next VA disability payment on January 1, 2023, he did not presently have funds available to redeem her.

24C. Rather than hold Niras for Plaintiff or make any accommodation for his disclosed financial circumstances as a disabled veteran, Dog Control adopted Niras out to a third-party couple, Dan and Rebecca Crosbie, without notifying Plaintiff. When Plaintiff inquired who had adopted Niras, Dog Control refused to disclose the adopter's identity, citing the adopter's request for anonymity. Plaintiff subsequently learned, and confirmed by his own repeated personal observation of Niras on the Crosbies' porch over the following two years, that the Crosbies were the undisclosed adopters — a couple against whom Plaintiff had previously been required to bring a court proceeding, in or about December 2019 or January 2020, to recover a different dog, Scout. Niras died of cancer at the Crosbie residence, Plaintiff having

been informed of her illness and impending euthanasia only by an unsolicited, anonymous message from Rebecca Crosbie shortly before Niras was put down.

25. On or about Sunday, February 9, 2023, a dog belonging to Plaintiff approached another person's dog in a friendly manner. No bite occurred, no injury resulted, and no medical record or other evidence of any attack exists. The other person nonetheless reported an attack.

26. Beginning the following morning, Monday, February 10, 2023, Defendant Gleason entered upon the curtilage of Plaintiff's residence without a warrant and without consent.

27. On or about February 12, 2023, Defendant Gleason substantially intensified that intrusion. He first approached the middle porch, one of the residence's two front entrances, where he observed one of Plaintiff's dogs, Keshi, through the adjacent window, barking at him. Rather than departing, Defendant Gleason then proceeded down the driveway into the back yard, where he observed two additional dogs — one in a crate and one on a chain tie-out — both barking at him.

28. Defendant Gleason then spent several minutes standing on his toes, leaning in, and looking through a side window of Plaintiff's residence, in the course of which he counted a fourth dog inside. That conduct was recorded by Plaintiff's own video camera.

28A. Also on February 12, 2023, Defendant Gleason was recorded on video telling one of Plaintiff's neighbors, in the course of soliciting a statement in support of the citation he was preparing, that Plaintiff's dogs had been attacking people. That statement was false. As alleged in paragraph 25, the only incident preceding this date involved a single, non-injurious, friendly approach between dogs, with no bite, no injury, and no medical or other evidence of any attack. Defendant Gleason had no basis to characterize that isolated encounter to Plaintiff's neighbor as dogs "attacking people."

28B. Two days later, on or about February 14, 2023, Defendant Gleason drove into Plaintiff's driveway while Plaintiff was not home and parked there, waiting for Plaintiff to return. When Plaintiff, upon returning and observing Defendant Gleason's vehicle in the driveway, continued driving rather than stop, Defendant Gleason pulled out and pursued Plaintiff's vehicle for approximately 1.2 miles before conducting a Terry stop. Defendant Gleason's stated basis for the stop was the absence of a New York State inspection sticker. That basis was false, and known by Defendant Gleason to be false: Plaintiff's vehicle has at all relevant times been registered, titled, and licensed in the State of Michigan, with Michigan plates, a fact known to Defendant Gleason from Plaintiff's approximately ten years of residency in the Village, and a vehicle registered and titled outside New York is not subject to a New York State inspection sticker requirement. The stop was accordingly not supported by reasonable suspicion of any actual violation, and is alleged as further evidence of animus and of the same

pattern, evident throughout this Complaint, of pursuing Plaintiff's vehicle when he sought to avoid an encounter.

29. At the June 2023 trial, Defendant Gleason testified that he observed one dog at the front door window, one dog on a tie-out in the backyard, and one dog in a crate — three dogs in total. He did not disclose in that testimony the extended side-window observation described in paragraph 28.

30. Plaintiff was nonetheless cited and adjudicated liable on four unlicensed-dog citations. Defendant Gleason's own account of his observations identifies only three distinct animals. Plaintiff does not allege in this action that the June 2023 judgment was wrongly decided; the discrepancy is alleged solely as evidence of animus and unreliability.

31. On or about late April or early May 2023, personnel of the Jefferson County Sheriff's Office responded to Plaintiff's residence purportedly to conduct a welfare check, based on an allegation — the source of which is not presently known to Plaintiff — that Plaintiff was suicidal. In light of the course of conduct alleged above, Plaintiff did not immediately present himself to the responding officers and instead monitored the situation from within his residence for a period of hours by listening to police radio scanner traffic.

32. While monitoring that same scanner traffic, Plaintiff heard responding personnel state that animal control was being called in and would remove Plaintiff's dog, Keshi, from a tree on Plaintiff's 1.86-acre parcel on the asserted ground that the dog lacked food and water, and assert that they had the authority to do so on that basis. That assertion was false: Keshi was secured on a metal chain to the tree, with shelter, food, and water, at all relevant times.

33. In order to prevent the threatened removal of Keshi on that false pretext, Plaintiff emerged from his residence and departed the property by vehicle with Keshi, bringing her food and water containers with him as he left — further evidencing that the officers' stated basis for removal was false. Officers activated emergency lights and pursued Plaintiff's vehicle for approximately one mile before Plaintiff stopped.

34. Officers ordered Plaintiff out of his vehicle and, as a condition of allowing him to leave and return to caring for his animals, required him to affirmatively state that he was not suicidal. During the stop, Plaintiff told the officers they had no right to remove his dog from the middle of his own land, and that under New York law a dog is personal property belonging to its owner.

35. In or about early July 2023 — approximately one month after the Justice Court trial described in paragraph 15, and approximately one month before the events of late July and August 2023 described below — Jefferson County and/or the Jefferson County Sheriff's

Office dispatched two to three marked patrol vehicles and four or more officers to Plaintiff's property to issue zoning or ordinance infractions. Plaintiff was at the time outdoors painting truck parts in the course of repairing the exhaust and fuel systems of his vehicle.

36. Defendant Gleason was personally present at that deployment. He did not himself serve the paperwork — that was served by another law enforcement or code enforcement official present — but stood at the rear of the group throughout.

37. Another officer present attempted to engage Plaintiff in conversation. Plaintiff said nothing, did not argue, and continued working. At no point did Plaintiff raise his voice, refuse a lawful order, or behave in a threatening manner.

38. Rather than hand the citation to Plaintiff, the officers left it — bearing a court date — on the tailgate or in the bed of Plaintiff's truck, and departed. This manner of delivery is consistent with a recurring practice, described further in Count IV below, of leaving documents at or on Plaintiff's property and approaching by indirect means rather than by ordinary knock-and-talk.

39. No legitimate purpose required four or more officers and multiple patrol vehicles to deliver a routine ordinance citation. The size and manner of the deployment served to intimidate Plaintiff and to display official displeasure with him, and is evidence of the animus alleged herein.

40. The conduct described in paragraphs 23 through 39, together with the conduct alleged below, reflects a continuous and escalating course of antagonism by Defendant Gleason and the Jefferson County Sheriff's Office toward Plaintiff from approximately 2014 through August 2023 and beyond, which intensified markedly in the two months following Plaintiff's June 2023 defense at trial.

B. The manhunt of late July and early August 2023

41. On or about July 30, 2023, Ms. Ratliff placed a call to law enforcement concerning a dispute over her access to the residential smart-home system at Plaintiff's property. Plaintiff had removed Ms. Ratliff's access from the smart-home suite, including its door-lock PIN codes and camera controls, after a dispute over her altering the audio settings of an exterior camera used to monitor short-term rental guests. Plaintiff did not intend to, and did not, prevent Ms. Ratliff from physically entering the residence: she retained her own set of physical keys and the garage door passcode, and could and did continue to enter the residence through the garage or with her keys at all relevant times. Of the means of physically entering the residence, only her ability to use the smart-lock PIN code was removed; her physical keys and the garage passcode continued to work throughout.

42. That call — concerning, at most, a domestic disagreement about a household electronic device — was escalated into a multi-day, multi-agency manhunt led by the New York State Police and involving the Jefferson County Sheriff's Office, directed at Plaintiff, from on or about July 30, 2023 through on or about August 2, 2023.

43. Defendant Gleason participated in, directed, and/or caused the escalation of that manhunt, including by directing the curtilage entry described in paragraphs 44 through 48 below, and by remaining personally involved throughout its duration, through and including August 2, 2023.

44. On July 30, 2023, in the course of the manhunt, two officers entered upon the curtilage of Plaintiff's residence without a warrant, without consent, and without exigent circumstances. They ran up the side of the house opposite the driveway, continued down to the garage, crossed the driveway to the rear ramp and deck, and attempted contact at the back door. Their movements were recorded by Plaintiff's own Google Nest video camera, and the July 30, 2023 date of this entry is confirmed by the timestamped recording.

45. At no point did those officers knock, or attempt to knock, at either of the two front entrances — the front porch or the middle porch, the latter being the residence's actual main entryway. Both were plainly visible and readily accessible. The officers bypassed both and went directly to the rear of the house.

45A. As one of the two officers approached the rear of the house together with a second, male officer, she ran back down the ramp toward the front of the driveway and called out, in substance, "We got a runner, boys!" — addressed to other personnel at the scene, including a person in high-visibility orange safety attire positioned on the sidewalk or the road. That characterization was inaccurate: Plaintiff was inside his residence and was not fleeing or attempting to evade apprehension. On information and belief, that exclamation was used to escalate the perceived urgency of the encounter, consistent with the other instances of inaccurate or unsupported characterizations by responding officers alleged elsewhere in this Complaint, including the false claim that Plaintiff's dog lacked food and water, as alleged in paragraph 32, and Defendant Gleason's own incomplete trial testimony, as alleged in paragraphs 29 through 30.

46. On information and belief, Defendant Gleason remained on the sidewalk or the road during this entry — either as the person in high-visibility orange safety attire described in paragraph 45A, or as another officer positioned there — and did not himself proceed to the rear of the house. The video recording of this encounter has since degraded in quality, and Plaintiff cannot rule out the alternative possibility that Defendant Gleason was instead the second, male officer who personally approached the rear of the house alongside the first officer

described in paragraph 45A; Plaintiff pleads that alternative as well, with Defendant Gleason's precise role to be confirmed through discovery of the responding officers' identities and reports.

47. Defendant Gleason's decision to remain on the sidewalk or the road, if that is where he was, was deliberate: in or about 2019 Plaintiff had told him directly that he would sue him if he again violated Plaintiff's privacy rights, as alleged in paragraph 18, and Defendant Gleason positioned himself so as to direct the intrusion while avoiding personal physical entry upon the property. In the alternative, if discovery reveals Defendant Gleason was instead the male officer who personally approached the rear of the house, he is liable for his own direct, personal participation in the warrantless curtilage entry.

48. Under either alternative, Defendant Gleason directed, ordered, and/or authorized, or personally participated in, the officers' approach and entry upon the curtilage, and did so knowing that no warrant had been obtained and that no consent had been given. His overall command role in, and continued involvement throughout, the manhunt, as alleged in paragraph 43, supports his responsibility for the entry regardless of which specific role he occupied at this moment.

49. On or about July 31, 2023, while Plaintiff remained inside his residence, a patrol vehicle stopped in the middle of the public road in front of Plaintiff's property and shined a spotlight into Plaintiff's driveway and the windows of his residence.

50. On or about the night of August 1 into August 2, 2023, between approximately 10:00 p.m. and 11:45 p.m., four marked patrol vehicles entered and proceeded down Heron Bay Cliffs Hollow, the easement leading to Plaintiff's property at Heron Bay Cliffs. That easement is a private right-of-way granted to property owners for their own use, not a public road, running from its entrance at New York State Route 12F, spanning approximately 0.2 to 0.3 miles, and passing through the private property of at least two other owners — a section belonging to a church and a section belonging to Amanda Rinehart — before reaching the section of the easement located on Plaintiff's own property. The easement does not skirt the perimeter of Plaintiff's property; it bisects it, running roughly east to west through the middle of the parcel. Defendants' entry upon this easement, without a warrant, consent, or exigent circumstances, was itself an intrusion upon Plaintiff's property, and required Defendants' vehicles to travel through the heart of the property, in close proximity to the camper in which Plaintiff maintains a residential presence at the property, using it as his sleeping quarters and kitchen when he makes use of it, to reach the location of the encounter described below, which occurred near the midpoint of the easement, at a point where Plaintiff maintains a second driveway leading to a camper and the river-facing cliff area of his property — well within the interior of Plaintiff's own land, not near any property boundary.

51. The four patrol vehicles positioned themselves at and around that second driveway, blocking it. Plaintiff, who had been asleep in his truck, parked in his own driveway approximately fifty feet from the camper he maintains at that location — not on the easement itself, which is a shared private right-of-way running through the middle of his land — confronted the responding officers and, for approximately ten to fifteen minutes, repeatedly told them that he did not wish to speak with them and directed them to leave his property; the officers refused, stating only that they "just want[ed] to talk." The officers eventually agreed to leave, stating, in substance, "Okay, we're leaving," and drove further down the easement onto a neighboring property with a vehicle turnaround before departing toward New York State Route 12F. That encounter continued past midnight, into August 2, 2023.

52. Plaintiff believed, based at minimum on a text message Ms. Ratliff sent him after the encounter — stating in substance that the officers "just don't want you to drive around and hurt yourself or someone" — that one or more of the departing vehicles remained positioned at or near the point where Heron Bay Cliffs Hollow meets New York State Route 12F for a period of time thereafter, so as to intercept Plaintiff if he attempted to leave the property by that route. Believing his only route of vehicular egress to be monitored and blocked, Plaintiff did not attempt to leave Heron Bay Cliffs.

53. Plaintiff did not in fact leave Heron Bay Cliffs until later in the day on August 2, 2023.

54. On August 2, 2023, Plaintiff went to the Hounsfield Justice Court to inquire of the court clerk regarding a pending matter he believed concerned a zoning or ordinance infraction for which he was scheduled to be arraigned that week, and/or the dog-citation matter described above.

55. Later that same day, as Plaintiff was leaving a 7-Eleven convenience store in Sackets Harbor, Defendant Gleason stepped out of his own vehicle, parked two spaces away, and called out, "KJ!" Startled, Plaintiff got into his truck and drove away. Defendant Gleason's continued personal pursuit of contact with Plaintiff on this fourth day of the manhunt, notwithstanding the confrontation of the previous night, is further evidence that the manhunt persisted as a course of conduct through August 2, 2023.

B-1. The true object of the manhunt: a pretextual psychiatric pickup sought as a means of financial control

56. The object of the manhunt was not any criminal investigation. No criminal charge was ever brought against Plaintiff arising out of the events of late July and August 2023.

57. The object of the manhunt was to have Plaintiff taken into custody and transported for involuntary psychiatric evaluation under Article 9 of the New York Mental Hygiene Law.

58. That object was not motivated by any genuine concern for Plaintiff's health or safety. Ms. Ratliff told Plaintiff directly, during the manhunt, that she was attempting to persuade him to accept "help," which she characterized to him as an opportunity to "have a rest at a center."

59. During this period Ms. Ratliff sent Plaintiff numerous text messages. Those messages conveyed, in substance and effect and consistently across the series: that she wished Plaintiff to accept "help"; that she was seeking to have him placed under an emergency psychiatric hold of approximately seventy-two hours; that she believed she would thereby obtain control over the couple's joint finances; and that she intended to come to New York and manage Plaintiff's affairs while he was confined. Plaintiff alleges the substance of those communications of his own personal knowledge as the recipient. The messages are in Plaintiff's possession and will be produced in discovery.

60. Ms. Ratliff's stated object was accordingly not limited to the couple's joint finances. It extended to the management of Plaintiff's affairs generally during a period of confinement she was seeking to bring about.

61. Ms. Ratliff's belief as to the legal effect of such a hold was mistaken. No provision of Article 9 of the New York Mental Hygiene Law transfers control of a person's finances to a spouse upon an emergency admission or observation. Her mistake is immaterial to this claim: what is alleged is her stated purpose, and the use of law enforcement to accomplish it, not the soundness of her legal theory.

62. Defendant Gleason knew or was deliberately indifferent to the fact that no genuine basis existed to believe Plaintiff was mentally ill and conducting himself in a manner likely to result in serious harm to himself or others, and nevertheless facilitated and participated in the effort to have Plaintiff taken into custody on that pretext.

63. The attempt did not succeed. Plaintiff was never taken into custody and was never transported for psychiatric evaluation. Plaintiff pleads the foregoing not as an independent seizure claim arising from the manhunt's stated psychiatric object, but as evidence of the object, motive, and malice underlying the conduct alleged in Counts I and III, and as context for the seizure by show of authority separately alleged in Count II below.

C. Gleason's cultivation of Ms. Ratliff

64. In the approximately two weeks following the manhunt, Defendant Gleason engaged Ms. Ratliff personally and repeatedly, outside the ordinary channels by which a sheriff's office communicates with a complainant.

65. On one or more occasions in the approximately two weeks following the manhunt described in paragraphs 41 through 55 — that is, on or about early-to-mid August 2023 — Defendant Gleason provided Ms. Ratliff with his personal cellular telephone number and invited her to contact him directly.

66. On one or more occasions during that same period — on or about early-to-mid August 2023, and in any event before the Arkansas filing described in paragraph 70 below — Defendant Gleason relayed to Ms. Ratliff, as though verified and reliable, the following allegations concerning Plaintiff, each of which was false or unverified and none of which Gleason had any legitimate law enforcement purpose in disclosing to a private citizen: (a) that Plaintiff had harassed a former fiancée; (b) that Plaintiff had harassed a former spouse; and (c) that Plaintiff was the subject of an order barring his entry into Canada, of which Plaintiff had never been officially notified.

67. Plaintiff is in possession of a lengthy 2022 text exchange with the former fiancée referenced in paragraph 66(a) which directly rebuts the harassment narrative Gleason relayed.

D. The coached email and the Arkansas proceeding

68. On or about early-to-mid August 2023, and in any event before August 15, 2023, Defendant Gleason coached Ms. Ratliff on the precise language she should send to Plaintiff in writing, and Ms. Ratliff thereafter transmitted to Plaintiff an email containing that scripted language. That email will be produced in discovery.

69. The purpose of the scripted communication was to manufacture a written record that could be used against Plaintiff in a legal proceeding.

70. On August 15, 2023, at 5:04 p.m., at Defendant Gleason's direction and/or encouragement, Ms. Ratliff commenced a protective-order proceeding against Plaintiff in the Circuit Court of Pulaski County, Arkansas, captioned Mollie Ratliff v. Kistilan Dark, Case No. 60DR-23-2834, by filing a Petition for Order of Protection.

71. At 5:58 p.m. that same evening, a notice of hearing issued setting the matter for September 14, 2023 at 9:30 a.m.

72. The Arkansas proceeding was commenced in a forum in which none of the events alleged in this Complaint occurred, in which Plaintiff has never resided, and which lies approximately 1,200 miles from Plaintiff's home in Sackets Harbor, New York and from every witness to the underlying events. It was so commenced as to burden Plaintiff and impair his ability to appear and defend.

73. Plaintiff was never served with the Arkansas petition. On September 14, 2023, the first scheduled hearing was cancelled, the docket reflecting: "PETITIONER APPEARED, NO SERVICE." The matter was reset to October 26, 2023 at 9:15 a.m.

74. On September 15, 2023, a return of service was filed reflecting "NON EST INVENTUS" — that Plaintiff could not be located or served.

75. On October 26, 2023, the second scheduled hearing was likewise cancelled, the docket reflecting: "HALLS SOUNDED, NO RESPONSE, DISMISSED." An Order to Dismiss and AOC Disposition Sheet were entered that day and the case was closed.

76. No order of protection, ex parte or final, was ever entered against Plaintiff. The proceeding was dismissed for want of service, not on the merits.

77. Ms. Ratliff appeared at the first scheduled hearing but did not appear at the second. Service was never accomplished on Plaintiff at his known and continuously occupied residence at 114 Dodge Avenue, Sackets Harbor, New York, at any point in the seventy-two days between filing and dismissal. The manner in which the proceeding was prosecuted — filed within hours, pursued once, then abandoned — is consistent with a purpose of creating and using the fact of a pending protective-order proceeding against Plaintiff, rather than of obtaining protection from him.

D-1. The December 2023 curtilage entry

78. On December 13, 2023, while Plaintiff was engaged in a scheduled telehealth appointment with his therapist, Mindy Barnes, a Department of Veterans Affairs provider based in Binghamton, New York — a session that began at 2:00 p.m. and was ongoing at 2:03 p.m., the time of the intrusion — one or more officers of the Jefferson County Sheriff's Office entered upon the curtilage of Plaintiff's residence without a warrant, without consent, and without exigent circumstances. The identity of the officer who approached the residence is not presently confirmed. On information and belief, that officer exited from the passenger side of the patrol vehicle, consistent with Defendant Gleason's practice, described elsewhere in this Complaint, of directing other officers' approach to Plaintiff's residence while a second person drove or otherwise accompanied him; Plaintiff does not presently know whether

Defendant Gleason himself was present in the vehicle, and reserves the right to amend this Complaint once that fact is confirmed through discovery, including a Freedom of Information Law request identifying which officers were on duty and dispatched to 114 Dodge Avenue on that date.

79. The officer or officers first approached the middle porch, one of the residence's two front entrances, and knocked, but received no answer. Rather than departing at that point, as the implied license recognized in Jardines permits, the officer or officers then proceeded directly and with evident purpose to the back yard — an area of the property located approximately 50 to 60 feet from the public road, Dodge Avenue — climbed the porch steps, and pounded on a set of glass French doors at the rear of the residence in an effort to compel Plaintiff to appear. The responding officer was observed to be carrying paperwork, consistent with routine service of a citation or notice rather than any emergency purpose. Plaintiff's contemporaneous telehealth appointment, confirmed by his own VA records and his therapist's records, establishes that no emergency, welfare concern, or exigent circumstance justified this continued intrusion onto the curtilage beyond the front porch, and this incident follows the same underlying pattern already alleged in paragraphs 26 through 28 (February 2023) and paragraphs 44 through 45 (July 30, 2023): officers ultimately resorting to a rear, non-primary entrance without a warrant, consent, or exigent circumstance. Plaintiff did not answer the door, and the officer or officers eventually departed without further incident — consistent with the absence of any genuine emergency, as a true welfare concern would not have been abandoned simply because no one answered.

D-2. The April 2024 Dog Control adoption denial

79A. In April 2024, two dogs bred by Plaintiff and previously placed with a couple, Stacy and Kane, named Bjorn and Hammer, got loose and were taken into custody by Jefferson County Dog Control. Dog Control publicly advertised Bjorn and Hammer as available for adoption, which is how Plaintiff learned they had been taken into custody and went to Dog Control to attempt to retrieve them. At the time, Stacy had recently lost her job, and she and Kane lacked the funds to redeem the dogs. Bjorn and Hammer were subject to a signed adoption contract between Plaintiff and Stacy and Kane, which provided that Plaintiff held the right of first surrender in the event they ever gave up the dogs, and that the dogs were not to be surrendered to Jefferson County Dog Control.

79B. Plaintiff attempted to adopt Bjorn and Hammer himself and was willing to pay the standard adoption fee. Dog Control informed Plaintiff that it maintained a policy under which intact male dogs would not be adopted to Plaintiff specifically, by name. Dog Control did not, at that time or at any time since, provide any explanation of the basis for a policy singling out Plaintiff individually, as opposed to a generally applicable policy concerning intact-male

adoptions. Plaintiff also informed Dog Control of the adoption contract described in paragraph 79A and told Dog Control that its refusal to allow him to adopt dogs that would, upon surrender, essentially be his own property under that contract was itself a violation of the contract's terms. Dog Control responded, in substance, that the contract was a matter "between [Plaintiff] and the third party" and not something it would consider.

79C. Plaintiff repeatedly requested that Dog Control's supervisor, Daniel Hunt, contact him to explain the basis for this policy, including by telephoning Dog Control's office on multiple occasions and by appearing in person to ask for him. Mr. Hunt never returned any of Plaintiff's calls or requests.

79D. After declining to allow Plaintiff to adopt Bjorn and Hammer, Dog Control reversed its position with respect to Stacy and Kane and agreed to allow them to redeem the dogs. Plaintiff personally provided Stacy the funds necessary to complete that redemption, as she still lacked them.

79E. In the course of Stacy and Kane's visit to redeem the dogs, a Dog Control employee told them, unprompted, in substance: "The guy came here, he tried to adopt them, we wouldn't give them to him." When Stacy or Kane asked why, the employee responded, in substance: "Well, you just don't know him like we do" — an unexplained, disparaging characterization of Plaintiff, offered to persons who did not ask for one.

79F. In January 2026, Plaintiff again raised this episode directly with Mr. Hunt. He stated that he had been new to his position at the time and that there had been "a lot going on," and represented that he had no knowledge of the policy or its basis. He again did not explain the policy, and no explanation has been provided to Plaintiff to date.

D-3. The August 13, 2024 Village Board meeting

79G. On August 13, 2024, at a Regular Meeting of the Village of Sackets Harbor Board of Trustees, the Village Zoning Enforcement Officer reported to the Board, and the Board thereafter discussed, ongoing zoning-enforcement action against Plaintiff. The Village's official written minutes of that meeting record: "The board discussed the letter from Jim Corbin, Village ZEO, regarding the ongoing enforcement issues with Kistalin and Gibson." Defendant Gleason was present at that meeting in his capacity as the Sackets Harbor Police Officer in Charge, a role in which he regularly reports to the Village Board.

79H. In the course of that discussion, Defendant Morgia, in his capacity as Mayor, personally formulated and articulated to the Board a strategy regarding Plaintiff's unpaid zoning fine, discussing with James A. Burrows, the Village Attorney, the cost of obtaining a judgment in

New York Supreme Court against Plaintiff, and stating, in substance, that the Village should continue accumulating fines and citations against Plaintiff until the total reached a threshold of approximately $5,000 to $10,000, at which point pursuing a Supreme Court judgment against Plaintiff, and thereafter placing a lien against Plaintiff's property, would be cost-justified.

79I. Defendant Gleason personally participated in this discussion, stating, in substance, that Plaintiff had been fined $360. Defendant Sova's participation was narrower: she stated, in substance, that Plaintiff owed more than $250 in fines and referenced a per-day fine amount, and separately stated, in substance, that the Village had "a problem tracking this guy down" — meaning Plaintiff — her stated concern being the practical difficulty of locating Plaintiff to issue citations, rather than the litigation strategy Defendant Morgia had articulated. Defendant Gleason responded, in substance, that even where the purpose was merely to check on Plaintiff rather than to cite him, Plaintiff would "hide in his attic for a week" to avoid the contact. That statement was false. Defendant Gleason had no personal basis to make it, having no means of observing Plaintiff's conduct inside his own residence. Plaintiff's reluctance to engage with responding officers, where it occurred, was a direct response to the course of conduct alleged throughout this Complaint.

79J. This discussion is alleged as further evidence of Defendants Morgia's, Gleason's, and Sova's continuing animus toward Plaintiff and of a coordinated pattern, formulated principally by Defendant Morgia, of using citation, fine, and enforcement mechanisms as leverage against Plaintiff specifically, with the express, stated object of accumulating fines to a threshold that would justify obtaining a Supreme Court judgment and placing a lien against Plaintiff's property, consistent with the course of conduct alleged throughout this Complaint and with the custom or policy alleged in Count IV and Count VII below.

E. Injury

80. As a direct and proximate result of the conduct alleged, Plaintiff suffered severe emotional distress, reputational harm, the destruction of his marriage and household, the loss of the use of and ability to jointly manage and let real property located at 6025 Flight Court, Jacksonville, Arkansas, the permanent loss of his dog Niras and the resulting emotional distress, financial expenditure incurred to redeem his dogs Bjorn and Hammer from a third party after Dog Control refused to allow him to do so directly, and the chilling of his willingness to continue complaining of and pursuing legal remedies against the Jefferson County Sheriff's Office.

**COUNT I**
**42 U.S.C. § 1983 — FIRST AMENDMENT RETALIATION**
(against Defendant Gleason)

81. Plaintiff repeats and realleges paragraphs 1 through 80.

82. Plaintiff engaged in activity protected by the First Amendment, principally by defending himself at the June 2023 Hounsfield Justice Court trial and there asserting that Defendant Gleason had violated his property and curtilage rights in generating the charges against him; and further by his 2019 statement to Defendant Gleason that he would sue him if Gleason again violated his rights, and by his other complaints and petitions as alleged in paragraphs 15 through 20.

83. Defendant Gleason knew of that protected activity, as alleged in paragraphs 17, 19 and 21.

84. The adverse action alleged below followed the June 2023 trial by approximately two months.

85. Defendant Gleason, acting under color of state law, took adverse action against Plaintiff by directing a warrantless curtilage entry during the manhunt, pleaded as part of the alternative continuing-course-of-conduct theory set forth in paragraph 8, by directing or participating in the blockade of Plaintiff's property at Heron Bay Cliffs, by relaying false and unverified derogatory allegations about Plaintiff to Plaintiff's spouse, by coaching her communications with Plaintiff, and by instigating and directing a protective-order proceeding against Plaintiff in a distant forum. Such action would deter a similarly situated person of ordinary firmness from continuing to engage in the protected activity.

86. Plaintiff's protected activity was a substantial and motivating factor in Defendant Gleason's conduct.

87. Defendant Gleason's conduct further included facilitating, directing, and/or participating in an effort to have Plaintiff taken into custody for involuntary psychiatric evaluation on a pretext Gleason knew to be unsupported, for the purpose of transferring control of Plaintiff's finances and property to Ms. Ratliff. An attempt by a law enforcement officer to have a citizen declared or treated as mentally incapable, in retaliation for that citizen's complaints against the officer's own agency, would deter a person of ordinary firmness from continuing to complain.

88. The causal connection between Plaintiff's protected activity and Defendant Gleason's conduct is established by the close temporal proximity between the June 2023 trial defense and the conduct alleged in paragraphs 41 through 77 — approximately two months — and independently by a continuous and escalating course of antagonism and surveillance directed

by Defendant Gleason at Plaintiff from approximately 2014 through August 2023, as alleged in paragraphs 23 through 40, and by Gleason's resort to allegations he knew to be unverified. The sequence is unbroken and escalating: the June 2023 trial defense; the disproportionate multi-officer ordinance deployment of early July 2023; and the manhunt and its aftermath in late July and August 2023.

89. Defendant Gleason's conduct was intentional, malicious, and in reckless disregard of Plaintiff's federally protected rights, warranting punitive damages.

**COUNT II**

**42 U.S.C. § 1983 — FOURTH AND FOURTEENTH AMENDMENTS**

**UNREASONABLE SEARCH AND SEIZURE**

(against Defendant Gleason and Does 1-10)

90. Plaintiff repeats and realleges paragraphs 1 through 80.

91. The curtilage of a residence — including its side yard, rear deck, and the ground immediately surrounding the home — is part of the home itself for Fourth Amendment purposes, and a warrantless intrusion upon it is presumptively unreasonable. Florida v. Jardines, 569 U.S. 1, 6 (2013). Curtilage is determined by reference to proximity to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken to protect the area from observation. United States v. Dunn, 480 U.S. 294, 301 (1987). As alleged in paragraphs 50 through 51, the location of the August 1-2, 2023 encounter was not a remote or open area of Plaintiff's land but a point near the middle of the parcel, at Plaintiff's second driveway serving his camper and the cliffside area of his property, well within the interior of the property and far removed from any boundary. Plaintiff's camper at that location serves as his sleeping quarters and kitchen when he makes use of it, and the driveway area immediately surrounding it — where Plaintiff was asleep in his truck, approximately fifty feet away, on the night in question — was used for the intimate activities of the home.

92. Defendants, acting under color of state law and without a warrant, without consent, and without exigent circumstances, entered upon Plaintiff's curtilage or private property on at least three separate occasions: (a) on July 30, 2023, as alleged in paragraphs 44 through 45, entering the curtilage of Plaintiff's residence at 114 Dodge Avenue, which entry is pleaded as background, as evidence of custom under Count IV, and in the alternative under the continuing-course-of-conduct theory pleaded in paragraphs 2 and 8, and not as an independent standalone claim; (b) on or about the night of August 1 into August 2, 2023, as alleged in paragraphs 50 through 52, entering Plaintiff's private easement at Heron Bay Cliffs, a private right-of-way for the use of property owners only and not a public road; and (c) on

December 13, 2023, as alleged in paragraphs 78 through 79, again entering the curtilage of Plaintiff's residence at 114 Dodge Avenue while Plaintiff was engaged in a documented telehealth appointment. Each of the entries described in subparagraphs (b) and (c) is independently sufficient to sustain this claim.

93. No implied license authorized any of these entries. The implied license that permits an officer to approach a residence is limited both in area and in purpose: it extends to the normal route to the front door, for the purpose of knocking, waiting briefly, and leaving if not received. Jardines, 569 U.S. at 8-9. It does not extend to circling the house, traversing the side yard, proceeding to a rear entrance, or entering a private easement. In the July 30, 2023 entry, neither of the two ordinary front entrances at 114 Dodge Avenue was ever attempted. In the December 13, 2023 entry, an officer did knock at one of the two front entrances, but rather than departing when no one answered, as the implied license required, proceeded beyond its scope to a rear entrance, as alleged in paragraph 79 — itself a distinct violation of Jardines' knock-and- leave limitation.

94. None of these intrusions was supported by probable cause or reasonable suspicion. The July 30, 2023 entry followed a domestic dispute over smart-home system access; the August 1-2, 2023 easement entry followed the same dispute's aftermath; and the December 2023 entry occurred while Plaintiff was verifiably engaged in a scheduled medical telehealth appointment.

95. To the extent Defendants characterize any of these entries as a welfare check, that characterization does not supply a Fourth Amendment justification. There is no freestanding "community caretaking" exception permitting warrantless entry upon a home, its curtilage, or a private easement appurtenant to it. Caniglia v. Strom, 593 U.S. 194, 196-99 (2021).

96. Nor was the conduct on any of these occasions consistent with a genuine belief that Plaintiff was in immediate danger. As to the July 30, 2023 entry, officers responding to a true emergency would have taken the direct and obvious route to a front entrance; instead they bypassed two front entrances and proceeded to the rear of the house, and falsely characterized Plaintiff as fleeing, as alleged in paragraph 45A. As to the December 2023 entry, Plaintiff was contemporaneously and verifiably engaged in a telehealth appointment, negating any genuine emergency basis for the intrusion.

97. On information and belief, Defendant Gleason — who, as alleged in paragraph 43, remained personally involved in the manhunt through August 2, 2023 — directed, authorized, or otherwise participated in the entry and blockade described in subparagraph 92(b), notwithstanding that Plaintiff did not personally observe him among the officers at the scene; Plaintiff reserves the right to amend this allegation once Defendant Gleason's specific role in that entry is confirmed through discovery. To the extent the July 30, 2023 entry is actionable

under the alternative continuing-course-of-conduct theory pleaded in paragraph 8, Defendant Gleason is personally liable for it. He directed, ordered, and/or authorized it, or personally participated in it, as alleged in paragraph 48. Whether he directed the intrusion from the sidewalk or the road, or personally entered the curtilage, the constitutional violation was accomplished by his own conduct. The identity of the officer or officers who personally effected the entries described in subparagraphs 92(b) and 92(c) are not presently known to Plaintiff and are pled against Defendants Does 1-10, to be identified through discovery.

98. Said conduct violated Plaintiff's rights under the Fourth and Fourteenth Amendments.

99. Independently of the search and curtilage-entry claims alleged above, Defendants effected a seizure of Plaintiff's person by show of authority. A seizure occurs when, by means of physical force or a show of authority, an individual's freedom of movement is restrained such that a reasonable person would not feel free to leave or otherwise terminate the encounter. United States v. Mendenhall, 446 U.S. 544, 554 (1980); California v. Hodari D., 499 U.S. 621, 626

99A. The encounter described in paragraph 51 was itself such a seizure. Four marked patrol vehicles positioned themselves at and around Plaintiff's second driveway, blocking it, while Plaintiff sat in his vehicle. For approximately ten to fifteen minutes, Plaintiff repeatedly told the officers that he did not wish to speak with them and directed them to leave his property; the officers refused to do so. A reasonable person in Plaintiff's position — surrounded by four patrol vehicles blocking his only means of egress from that location, and rebuffed when he directly and repeatedly asked the officers to leave — would not have felt free to terminate the encounter. This seizure was not supported by probable cause, reasonable suspicion, or any exigent circumstance, and Plaintiff personally witnessed and experienced it directly. (1991).

100. Plaintiff believed, as alleged in paragraph 52 and based on a text message from Ms. Ratliff, that this seizure continued after the encounter described in paragraph 51 concluded, when one or more officers remained positioned at or near the only point of vehicular access between Heron Bay Cliffs and the public road, New York State Route 12F, so as to intercept Plaintiff if he attempted to leave by that route.

101. If Plaintiff's belief as alleged in paragraph 100 is correct, a reasonable person aware that the sole route of vehicular egress from his property was being monitored and blocked by law enforcement would not have felt free to leave. In any event, Plaintiff, believing exactly that, did not attempt to leave Heron Bay Cliffs, and did not in fact leave until later in the day on August 2, 2023, as alleged in paragraphs 52 through 53. The seizure described in paragraph 99A independently establishes the Fourth Amendment violation alleged in this Count regardless of whether the encounter continued as alleged in paragraph 100.

102. This seizure was not supported by probable cause, reasonable suspicion, or any exigent circumstance. It arose from the same domestic dispute over smart-home system access described above, and was, on information and belief, connected to the same pretextual welfare and Article 9 objective alleged in paragraphs 56 through 63.

103. Said conduct violated Plaintiff's rights under the Fourth and Fourteenth Amendments.

**COUNT III**
**42 U.S.C. § 1983 — CONSPIRACY TO RETALIATE**
(against Defendant Gleason)

104. Plaintiff repeats and realleges paragraphs 1 through 80.

105. Defendant Gleason and Ms. Ratliff reached an agreement, express or tacit, to use the machinery of a legal proceeding — including the involuntary-commitment machinery of Article 9 of the New York Mental Hygiene Law and the protective-order machinery of the State of Arkansas — to injure Plaintiff, to obtain control of his finances and property for Ms. Ratliff's benefit, and to punish and chill his protected activity.

106. The shared unlawful objective of the agreement was not any legitimate law enforcement or medical purpose. It was to have Plaintiff declared or treated as mentally incapable so that his finances and property could be taken over, and to silence his complaints against the Jefferson County Sheriff's Office.

107. In furtherance of that agreement, Gleason supplied Ms. Ratliff with a private communication channel, supplied her with false and unverified derogatory information about Plaintiff, scripted her written communications to Plaintiff, and directed her to commence the Arkansas proceeding; and Ms. Ratliff commenced that proceeding.

108. Ms. Ratliff acted in concert with Defendant Gleason, a state actor, in furtherance of the agreement alleged above. Dennis v. Sparks, 449 U.S. 24, 27-28 (1980).

109. Plaintiff was injured as a result.

**COUNT IV**
42 U.S.C. § 1983 — MONELL LIABILITY (County of Jefferson)

110. Plaintiff repeats and realleges paragraphs 1 through 80.

111. The conduct alleged was undertaken pursuant to a custom, practice, or policy of the Jefferson County Sheriff's Office, and/or reflects deliberate indifference in the training and supervision of its officers, evidenced by a persistent and recurring pattern spanning approximately 2014 through 2026, including: (a) approaching Plaintiff's residence by circumventing available, obvious entrances in favor of side-yard, rear, or window-based approaches, as alleged in paragraphs 26 through 28 (February 2023), paragraphs 44 through 45 (July 30, 2023), and paragraphs 78 through 79 (December 2023); (b) leaving citations, notices, or other process on Plaintiff's property or vehicle rather than effecting direct, face-to-face service, as alleged in paragraph 38; (c) deploying disproportionate numbers of officers to address minor, non-violent code, licensing, or ordinance matters involving Plaintiff, as alleged in paragraphs 35 through 39; (d) resorting to pretextual mental-health or welfare-check authority, coupled on at least one occasion with a false threat to remove Plaintiff's property (his dog) through animal control, as a means of compelling Plaintiff's presence or compliance, as alleged in paragraphs 31 through 34 (April-May 2023) — a tactic materially similar in kind to the pretextual Article 9 involuntary-commitment effort alleged in paragraphs 56 through 63 (July-August 2023); (e) positioning patrol vehicles to block a resident's ability to leave his own property, as alleged in paragraphs 50 through 52 (August 1-2, 2023); (f) escalating enforcement and investigative activity directed at Plaintiff specifically in temporal proximity to Plaintiff's complaints and legal challenges against the Sheriff's Office and other local authorities, as alleged throughout paragraphs 15 through 79, and personally participating in and endorsing a fine-escalation strategy directed at Plaintiff, as alleged in paragraphs 79G through 79J (August 2024); and (g) using Dog Control's custody of Plaintiff's animals as a point of leverage or a means of disparate treatment, including the non-consensual transfer of Plaintiff's dog Niras to a third party without notice to Plaintiff despite Dog Control's knowledge of his ownership, as alleged in paragraphs 24A through 24C (January 2023), and the application of an adoption-eligibility policy targeting Plaintiff by name without any articulated rational basis, as alleged in paragraphs 79A through 79F (April 2024 and continuing).

112. Plaintiff's May 2023 Freedom of Information Law request to the Jefferson County Sheriff's Office, as alleged in paragraph 20, placed the County on actual notice of the pattern described above. On information and belief, no investigation, discipline, retraining, or other corrective action followed. The County thereby ratified Defendant Gleason's conduct and was deliberately indifferent to the ongoing risk of constitutional injury it posed to Plaintiff.

113. On information and belief, Jefferson County has, by local law and/or by its practice of providing legal defense and indemnification to deputies of the Jefferson County Sheriff's Office sued for conduct occurring in the course of their duties, assumed responsibility for the acts of the Sheriff and his deputies within the meaning of N.Y. Const. art. XIII, § 13(a), and/or the Sheriff is the County's final policymaker with respect to the law enforcement practices alleged herein.

114. This pattern is sufficiently persistent, widespread, and longstanding to constitute a custom or practice of the Jefferson County Sheriff's Office, rather than the isolated conduct of a single officer on a single occasion.

115. Said custom or policy was the moving force behind the deprivation of Plaintiff's rights. Monell v. Dep't of Soc. Servs.,
**436 U.S. 658 (1978).**

**COUNT V**
**42 U.S.C. § 1983 — FOURTEENTH AMENDMENT**
**EQUAL PROTECTION ("CLASS OF ONE")**
(against County of Jefferson)

116. Plaintiff repeats and realleges paragraphs 1 through 80.

117. The Equal Protection Clause of the Fourteenth Amendment protects individuals from intentional and irrational differential treatment by government actors, even absent membership in any protected class, where the plaintiff has been intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).

118. Jefferson County Dog Control, a department and agency of Defendant County of Jefferson, maintained and applied a policy, as alleged in paragraphs 79A through 79B, under which intact male dogs would not be adopted to Plaintiff specifically, by name — a restriction not shown to have been applied to any other individual member of the public.

119. No rational basis for this policy, as applied specifically and individually to Plaintiff, has ever been articulated by Dog Control, notwithstanding Plaintiff's repeated direct requests for an explanation, as alleged in paragraphs 79C and 79F.

120. Dog Control's application of this policy was arbitrary and irrational, and, on information and belief, motivated by the same unexplained animus toward Plaintiff reflected in the disparaging characterization of him described in paragraph 79E, and consistent with the broader course of antagonism toward Plaintiff by Jefferson County law enforcement and affiliated agencies alleged throughout this Complaint.

121. As a direct result of this policy, Plaintiff — who had bred Bjorn and Hammer and previously placed them with Stacy and Kane, their actual owners, as alleged in paragraph 79A — was denied the ability to adopt the dogs himself when Dog Control took them into custody,

and was instead required to expend his own funds to enable Stacy and Kane to redeem them, notwithstanding the absence of any rational basis for treating Plaintiff differently from any other prospective adopter.

122. This claim is timely: the conduct alleged occurred in April 2024 and continued, in the form of Dog Control's continuing non-disclosure of the policy's basis, as recently as January 2026, well within the three-year limitations period applicable to this action. See paragraph 8.

**COUNT VI**
**42 U.S.C. § 1983 — FOURTEENTH AMENDMENT**
**EQUAL PROTECTION / SELECTIVE ENFORCEMENT**
(against Defendants Morgia and Sova)

123. Plaintiff repeats and realleges paragraphs 1 through 80.

124. As alleged in paragraphs 79G through 79J, on August 13, 2024, Defendant Morgia, in his capacity as Mayor of the Village of Sackets Harbor, formulated and presented to the Village Board a deliberate strategy to accumulate fines and citations against Plaintiff specifically until the total reached a threshold sufficient to justify the cost of obtaining a New York Supreme Court judgment against him and thereafter placing a lien against his property, having discussed that strategy beforehand with the Village Attorney. Defendant Sova participated in and endorsed the same discussion in her capacity as a Village Trustee.

125. Selective enforcement of otherwise generally applicable regulations against a particular individual, based on impermissible considerations or malicious intent to injure rather than any legitimate governmental purpose, violates the Equal Protection Clause of the Fourteenth Amendment. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980).

126. No legitimate governmental purpose justifies a strategy calibrated not to secure compliance with any zoning or code requirement, but specifically to accumulate a dollar figure sufficient to justify the cost of litigation culminating in a lien against a particular individual's home. The strategy Defendant Morgia formulated and presented, and which Defendant Sova endorsed, was not directed at remedying any condition of Plaintiff's property; it was directed at reaching a litigation threshold. Indeed, the zoning violation underlying the September 19, 2023 default judgment had already been remedied — the building materials at issue had been removed, and no further notice of violation concerning them has been sent since — meaning any daily-accrual fine tied to that specific violation was no longer available to Defendants. A citation for any new or different condition would arise under a separate basis and could not simply aggregate onto the existing threshold. On information and belief, Defendants'

discussion of continuing to "accumulate fines and citations" therefore contemplated inventing or manufacturing additional, unrelated grounds for citation against Plaintiff specifically, rather than pursuing any bona fide code-enforcement purpose.

127. Defendants Morgia's and Sova's endorsement of this strategy was made with knowledge of, and continued, the same animus toward Plaintiff reflected throughout this Complaint, including Defendant Gleason's contemporaneous and false characterization of Plaintiff, alleged in paragraph 79I, made in their presence and without objection from either of them.

128. As a direct result of this conduct, Plaintiff has been subjected to accumulating fines — including six dog-related citations issued at once and one zoning citation — and the ongoing threat of a forced lien against his home. On information and belief, Defendants have sought additional grounds to fine Plaintiff, or to compound his existing unpaid fines, specifically while Plaintiff has been attempting to appeal and challenge the underlying default judgment and dog-related fines on the ground that they arose from the unlawful search and seizure alleged elsewhere in this Complaint, in order to enable those fines to be brought before the Court and thereby advance the lien strategy described above. Plaintiff has also suffered emotional distress from being made aware, in a public government proceeding, that public officials were coordinating a strategy to take his property.

129. This claim is timely: the conduct alleged occurred on August 13, 2024, well within the three-year limitations period applicable to this action. See paragraph 8.

**COUNT VII**
**42 U.S.C. § 1983 — MONELL LIABILITY**
(against Village of Sackets Harbor)

130. Plaintiff repeats and realleges paragraphs 1 through 80.

131. The strategy alleged in paragraphs 79G through 79J was formulated and presented by the Village's own Mayor, discussed with the Village's own attorney, and endorsed by a Village Trustee, at an official meeting of the Village Board of Trustees — the Village's final policymaking body with respect to the enforcement matters at issue. Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81 (1986) (a single decision by officials with final policymaking authority may establish municipal liability).

132. This conduct constitutes an official policy or custom of Defendant Village of Sackets Harbor within the meaning of Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), and was the moving force behind the deprivation of Plaintiff's rights alleged in Count VI.

133. This claim is timely for the same reasons stated in paragraph 129.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Award compensatory damages against Defendants in an amount to be determined at trial;

B. Award nominal damages against Defendants in the event compensatory damages are not proven at trial;

C. Award punitive damages against Defendants Gleason, Sova, and Morgia in their individual capacities;

D. Award reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, to the extent Plaintiff is represented by counsel at any stage of this action;

E. Pursuant to Valentin v. Dinkins, 121 F.3d 72 (2d Cir. 1997), direct Defendant County of Jefferson, and/or the New York State Police, to ascertain and disclose the full names and service addresses of Defendants John and Jane Does 1-10;

F. Declare that Jefferson County Dog Control's policy of denying Plaintiff, by name, the ability to adopt intact male dogs, as alleged in Count V, violates the Equal Protection Clause of the Fourteenth Amendment, and enjoin its continued application;

G. Declare that the fine-escalation strategy alleged in Counts VI and VII, formulated by Defendant Morgia and endorsed by Defendant Sova, violates the Equal Protection Clause of the Fourteenth Amendment, and enjoin its continued application;

H. Pursuant to N.Y. C.P.L.R. 311(a)(4), direct that Defendant Village of Sackets Harbor be served through its Village Clerk;

I. Grant such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## VERIFICATION

I, Kistilan Jerah Dark, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Complaint, that the factual allegations herein are true and correct to the best of my own personal knowledge, except where stated on information and belief, and that as to those allegations I believe them to be true.

Dated: August 3, 2026

Kistilan Jerah Dark
Plaintiff, Pro Se
114 Dodge Avenue
Sackets Harbor, NY 13685
Telephone: 231-818-2880
Email: kistilan@yahoo.com